UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MCI COMMUNICATIONS SERVICES, INC., for itself and certain of its affiliates doing business as Verizon Business Services, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Receiver for Washington Mutual Bank, <br><br> Defendant. | Civil Action No. 10-0579 (ABJ) |

## MEMORANDUM OPINION

Plaintiff MCI Communications Services, Inc., d/b/a Verizon Business Services ("Verizon"), brings this action against the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as the receiver for Washington Mutual Bank. The complaint seeks judicial review of the FDIC's denial of Verizon's claims for compensatory damages stemming from the FDIC's repudiation of a telecommunications services contract between Verizon and Washington Mutual Bank. FDIC moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). For the reasons stated below, the Court will grant defendant's motion in part and deny it in part.

I.  **Background**

Washington Mutual Bank ("WaMu") was a federal savings and loan with banking branches located throughout the United States. Compl. ¶ 6. On December 5, 2006, WaMu and Verizon entered into the Second Amended and Restated Master Service Agreement (the

"SARA"), under which Verizon was to provide communications and related support and management services to WaMu for an initial five-year term. *Id.* ¶ 7. The parties began performing their obligations under the SARA, but on September 25, 2008, the United States Office of Thrift Supervision closed WaMu and appointed the FDIC as its receiver. *Id.* ¶¶ 8–9. At the same time, the FDIC sold substantially all of WaMu's assets to JP Morgan Chase Bank, N.A. ("JPMC") through a Purchase and Assumption Agreement, which gave JMPC the option to assume certain WaMu service contracts. *Id.* ¶ 9; *see also* Def.'s Mem. in Support of the Mot. for J. on the Pleadings ("Def.'s Mem.") at 2.

The SARA was one of the contracts transferred to JPMC, and JPMC continued to perform under the SARA for the first nine months of the receivership. Compl. ¶ 10. JPMC paid Verizon for all of the post-receivership services it received during that nine month period. *Id.* ¶ 11.

JPMC then exercised its right not to assume the SARA and transferred it back to the FDIC, which then repudiated the contract effective as of July 1, 2009, pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 18 U.S.C § 1821(e)(1). *Id.* ¶ 12. Although the FDIC is authorized to repudiate an insolvent bank's contracts, FIRREA provides that the injured party may sue the FDIC, as the receiver, for breach of contract. Under the terms of the statute, the receiver's liability for any breach is "limited to actual direct compensatory damages." 12 U.S.C. § 1821(e)(3)(A)(i).

On August 26, 2009, Verizon filed a claim for what it characterized as actual direct compensatory damages sustained as a result of the early repudiation of the SARA. Compl.¶ 15. The FDIC disallowed the claim in its entirety on February 11, 2010. *Id.* ¶ 16. Verizon then filed

this action on April 12, 2010, pursuant to 12 U.S.C. § 1821(d)(6), to obtain judicial review and reversal of the FDIC's determination. *Id.* ¶ 17.

In its complaint, Verizon asserts claims for several categories of alleged direct compensatory damages. In Count I, Verizon seeks approximately $21.4 million in damages comprised of three categories: (1) $19.3 million in "loyalty, service and other credits" that Verizon allegedly granted to WaMu against sums owed under a prior contract as a material inducement to enter into the SARA and commit to performance over the five-year term; (2) material and labor costs incurred by Verizon in connection with facilities build-out, data conversion, and the migration of WaMu to Verizon's network; and (3) "other out-of-pocket costs, capital expenditures, and financial concessions" that Verizon incurred. *Id.* ¶ 20–23.

In Count II, Verizon seeks over $2.8 million for severance payments, outplacement costs, and the cost of continuing health benefits that Verizon incurred or will incur in connection with employees who were hired in reliance upon WaMu's execution of the five-year contract and were terminated early as a result of the repudiation. *Id.* ¶ 25–26.

In Count III, Verizon alleged that it incurred liabilities with a third-party vendor to deliver services to WaMu as a result of the repudiation of the SARA.

On September 10, 2010, FDIC moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). In its opposition to that motion, Verizon conceded to entry of judgment on the pleadings in favor of FDIC with respect to Count III because those expenses "are considered as a legal matter to be indirect or consequential damages, as opposed to direct compensatory damages." Pl.'s Opp. at 21.[1] Accordingly, only Counts I and II remain.

---

1  Verizon originally brought this action for itself and certain of its affiliates, but FDIC argued in its motion that Verizon does not have standing to assert claims on behalf of unnamed affiliates. Def.'s Mem. at 4 n.1  Verizon stated in its opposition that the damages it sought in

## II. Legal Background

### A. Standard of Review

Although Verizon styles its complaint as a request for "judicial review" of the FDIC's denial of its claims, judicial review of FDIC's determination to disallow a claim is not permitted. 12 U.S.C. § 1821(d)(5)(E). Rather, this Court has jurisdiction to decide Verizon's claims *de novo*. *Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 65 (D.C. Cir. 1992) ("*OPEIU I*").

A motion for judgment on the pleadings pursuant to Rule 12(c) may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Longwood Vill. Rest., Ltd. v. Ashcroft*, 157 F. Supp. 2d 61, 66 (D.D.C. 2001), citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Put another way, "[i]f there are allegations in the complaint which, if proved, would provide a basis for recovery, the Court cannot grant judgment on the pleadings." *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (internal quotations and citations omitted). "The standard of review for such a motion is essentially the same as the standard for a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Longwood*, 157 F. Supp. 2d at 66–67 (citations omitted).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two

---

Count III were the only ones "not incurred entirely by the named Plaintiff in this action, MCI Communications Services, Inc., d/b/a Verizon Business Services," so Verizon no longer seeks to bring this action on behalf of certain of its affiliates. Pl.'s Opp. at 21 n.6.

principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."129 S. Ct. at 1949. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 1950.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*. at 1949, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. The complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating a motion for judgment on the pleadings under Rule 12(c), the Court may consider facts alleged in the complaint as well as documents attached to or incorporated by reference in the complaint. *Qi v. FDIC*, 755 F. Supp. 2d 195, 199–200 (D.D.C. 2010).[2]

---

2   Throughout the complaint plaintiff repeatedly references the SARA, the contract upon which this case is based. The Court will therefore consider the SARA in deciding defendant's Rule 12(c) motion.

### B. The FIRREA Framework

As the receiver of an insolvent financial institution, the FDIC may repudiate the bank's contracts under FIRREA. 18 U.S.C § 1821(e)(1). Repudiation is treated as a breach of contract giving rise to an ordinary contract claim for damages. *ALLTEL Info. Svcs. v. FDIC*, 194 F.3d 1036, 1039 (9th Cir. 1999). But damages are not assessed according to ordinary contract principles – rather, they must be determined in accordance with the terms of the statute.

FIRREA explicitly limits damages for repudiation to "actual direct compensatory damages," 12 U.S.C. § 1821(e)(3)(A), and it bars recovery for "punitive or exemplary damages; damages for lost profits or opportunities; or damages for pain and suffering." *Id.* § 1821(e)(3)(B).[3] The statute itself does not define "actual direct compensatory damage," nor does the statute's legislative history shed light on its meaning.[4] But the D.C. Circuit and other courts have considered what would qualify as direct compensatory damages under FIRREA.

---

3   12 U.S.C. § 1821(e) provides:
   (3) Claims for damages for repudiation
      (A) In general
      Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be –
         (i) limited to actual direct compensatory damages; and
         (ii) determined as of –
            (I) the date of the appointment of the conservator or receiver; or
            (II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.
      (B) No liability for other damages
      For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include –
         (i) punitive or exemplary damages;
         (ii) damages for lost profits or opportunity; or
         (iii) damages for pain and suffering.

4   *McMillan v. FDIC*, 81 F.3d 1041, 1054 (11th Cir. 1996) ("We note that there is no relevant legislative history [to help interpret the statutory term 'actual direct compensatory damages']; the parties have cited none, and we have been able to find none.").

In *Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 27 F.3d 598, 604 (D.C. Cir. 1994) ("*OPEIU II*"), the D.C. Circuit explained it this way:

> Congress appears to us to have wished to distinguish between those damages which can be thought to make one whole and those that are designed to go somewhat further and put a plaintiff securely in a financial position he or she would have occupied but for the breach.

*See also ALLTEL*, 194 F.3d at 1040 (same). The court noted in *OPEIU II* that Congress expressly prohibited any recovery for lost profits and opportunities, and it observed that such amounts "have a speculative nature," not just as to the amount that might be earned, but whether they will be realized at all. 27 F.3d at 604. While "Congress did not eliminate *all* claims founded on repudiated contracts," *id.*, it did deny the right to recover what the plaintiff would have been in a position to earn in the future had the contract been performed.[5] So even though lost profits are a form of actual damages, *ALLTEL*, 194 F.3d at 1040, they are a subset of compensatory damages that are specifically excluded under the statute in order to limit allowable claims for repudiated contracts. 12 U.S.C. § 1821(e)(3)(B)(ii).

In *OPEIU II*, the union representing employees of the closed bank made a claim for severance payments to which the employees were entitled under the terms of their collective bargaining agreement. The FDIC, as receiver, had repudiated the agreement. The court held that the severance payments qualified as direct compensatory damages under FIRREA because they were "consideration for entering into (or continuing under) the employment contract." *Id.* at 604. The court distinguished the payments from the types of damages not permitted under the statute; it explained that under the agreement at issue, severance pay "has already vested and

---

5     The Court observed that this differentiation is also recognized in the section of the statute which precludes a lessor's recovery of lost future rent. *Id.* at 604, citing 12 U.S.C. §1821(e)(4). A party that breaches a contract would owe these types of damages – lost profits and future rents – not because the plaintiff has already accrued or earned that amount under the contract, but because, absent the breach, the plaintiff would have been in a position to earn those sums. *Id.*

only its amount is subject to contingencies, whereas whether future profits and opportunities will be realized at all is a matter of speculation, since they have not accrued at the time of the repudiation." *Id*.

The Ninth Circuit has also held that "the statute limits damages to those 'flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation.'" *ALLTEL*, 194 F.3d at 1041, quoting *McMillian*, 81 F.3d at 1055. *See also Westberg v. FDIC*, 759 F. Supp. 2d 38, 47 (D.D.C. 2011) (same). In *ALLTEL*, the plaintiff sought damages for breaches by FDIC, as receiver, of two separate contracts. The plaintiff filed claims on both the accounts receivable balance, as well for a monthly fee on the remaining 54 months of the contract. FDIC allowed the former but disallowed the latter because they were not direct compensatory damages under FIRREA. *Id.* at 1038. The court agreed:

> [T]he ascertainable nature of ALLTEL's future profits does not render them recoverable because, rather than making ALLTEL whole, they would put ALLTEL in the financial position it would have occupied but for the breach. By contrast, the claim for the outstanding accounts receivable balance, allowed by the FDIC, constituted compensation already earned and thus is recoverable.

*Id.* at 1041. The court further explained that even if the contracts provided that the monthly payments were to be paid for the duration of the term of the agreement, such payments "would best be characterized as liquidated damages, for the minimum monthly payments would constitute an estimate of what ALLTEL would have received had the Agreements been performed." *Id.* at 1043. The court found that such damages would not constitute "actual direct compensatory damages" and thus would not be compensable under FIRREA. *Id. See also OPEIU II*, 27 F.3d at 602 (noting that liquidated damages are not recoverable because they are, "by definition, not *actual*" damages.); *RTC v. Management, Inc.*, 25 F.3d 627, 632 (8th Cir.

8

1994) (finding that a liquidated damage clause for future lost profits was not compensable under FIRREA).

The D.C. Circuit has also held that "reliance damages," which are intended to make a contracting party whole after a breach, are recoverable under FIRREA. *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 249 (D.C. Cir. 1995). These damages give the plaintiff "the repayment of his expenditures in preparing to perform and in part performance," and put him "in as good a position as he was in before the promise was made." *Id.* In *Nashville Lodging*, the appellant sought to recover fees it had paid to secure a refinancing agreement that was later repudiated by the receiver. The receiver argued that restitution damages are not recoverable because the "actual direct compensatory damages" in the statute are meant to be a forward-looking remedy, the purpose of which is to put the party in as good of a position as he would have been had the contract been completed. *Id.* at 245. The court rejected this argument, reasoning that the retrospective nature of the damages did not render them non-compensatory, even though "the ordinary measure of damages for breach of contract is forward looking and seeks to protect the non-breaching party's 'expectation interest.'" *Id.* "The fact that reliance damages are backward-looking does not destroy their pedigree as a species of compensatory relief," and such damages are "presumptively recoverable under FIRREA." *Id.* at 246, citing *DPJ Co. Ltd. Partnership v. FDIC*, 30 F.3d 247 (1st Cir. 1994).[6] This holding makes sense in

---

6 The court in *Nashville Lodging* stated in dicta that damages aimed to put the injured party "where he would have been if the contract had been fulfilled" are also presumptively recoverable under FIRREA. 59 F.3d at 246. But the court was not addressing a situation where the plaintiff sought this type of expectation damages, and the D.C. Circuit has separately explained – in a lengthy discussion – why those damages are not recoverable under FIRREA. *OPEIU II*, 27 F.3d at 604. So this Court does not read *Nashville Lodging* to hold that FIRREA allows recovery for damages to put a plaintiff in the same position he would have occupied but for the breach. *See ALLTEL*, 194 F.3d 1042 (explaining that "*Nashville Lodging* does not hold that FIRREA

9

light of FIRREA's prohibition against recovery of the ordinary, forward-looking measures of damages: lost profits and liquidated damages.

In sum, reading *Nashville Lodging* in conjunction with *OPEIU II*, the case law of other circuits, and the statute itself, the Court concludes that a party seeking damages under FIRREA is entitled to the actual compensatory damages that will make it whole – which would include out-of-pocket costs incurred in preparing to perform, as well as what the plaintiff has earned for its past performance.[7] To the extent that a plaintiff is seeking to recover its lost profits or opportunities, or it is proffering what is in essence a liquidated damages claim, those claims must be denied.

## ANALYSIS

### III. Certain Claims May Be Permitted Under FIRREA

The FDIC argues that none of damages alleged in the complaint are direct, compensatory damages, and they are therefore not recoverable under the terms of the statute. Assessing each category of claimed damages separately, the Court agrees with the FDIC only in part. The Court disagrees with the FDIC with respect to the damages in Count I, finding that some of those damages may be recoverable. At the same time, the Court agrees with the FDIC that Counts II and III seek indirect damages that are barred under the statute. Therefore, judgment on the pleadings is appropriate for Counts II and III of the complaint.

---

authorizes ordinary contract damages, nor that 'actual direct compensatory damages' is a 'benefit of the bargain' standard.").

7   In this case, there is no issue regarding sums due Verizon for its past performance since those were fully paid by JPMC.

### A. Count I: Credits

Verizon seeks $19,300,000 in "loyalty, service and other credits" that it alleges it granted WaMu "against sums that were due and payable to Verizon" under a prior contract to induce WaMu to enter into the SARA and commit to performance over the entire five-year term. Compl. ¶ 21. The parties' briefs – as opposed to the pleadings – shed a little more light on how each type of credit differs from the others, and it may be that when the factual record is fully developed not all of the $19 million is recoverable. But because the Court cannot conclude based on the *pleadings* that there is no set of facts under which plaintiff could prevail on its claim with respect to any of these credits, it will deny the motion for judgment on the pleadings with respect to Count I.

#### 1. Loyalty credits

In its brief, Verizon explains that the amount involved was "due and payable to Verizon under the prior agreement between the parties (*i.e.*, the predecessor contract to the SARA), the First Amended and Restated Master Services Agreement ("FARA")." Pl.'s Opp. at 6. It argues that the WaMu receivable was, in essence, an asset, and that its willingness to forgive the debt "was an actual financial concession, no less than an out-of-pocket expenditure in that amount, that Verizon incurred as an express condition to entry into the SARA with WaMu." *Id.* Since under some set of facts, the plaintiff could prevail on this claim, the Court cannot dismiss this portion of Count I under Rule 12(c).

The FDIC argues that the amounts owed were due under a prior contract, and therefore, they cannot be claimed as damages for a breach of the SARA. But the fact that the amounts owed to Verizon were due under a contract that predated the repudiated contract does not necessarily bar recovery under FIRREA. In *DPJ Co. Ltd. Partnership v. FDIC*, 30 F.3d 247,

248 (1st Cir. 1994), the plaintiffs had entered into a commitment letter agreement with a bank under which the plaintiffs had to meet certain conditions to obtain a line of credit. The plaintiffs incurred about $180,000 in costs to meet those conditions, at which point the bank provided the line of credit and the plaintiff began borrowing on it. *Id.* After the bank failed and the FDIC, as receiver, repudiated the line of credit agreement, the plaintiff sought to recover the costs it incurred pursuant to the original commitment letter. The court held that such expenditures qualified as direct compensatory damages – even though they were made pursuant to a separate agreement that was not repudiated – because it was the plaintiff's satisfaction of the conditions in the commitment letter that gave rise to the bank's obligation to establish the line of credit. *Id.* at 250. In other words, under a reliance theory, the plaintiff was entitled to recover the expenses it incurred as a condition to entry into the repudiated contract. *Id.* at 249. The court rejected arguments by the receiver that these out of pocket expenditures were simply compensation for a lost opportunity, and it permitted the plaintiff to recover money "actually spent under the commitment letter agreement" to obtain the line of credit. *Id.* at 249.

Here, Verizon alleges in the complaint that it granted the credits "as a material inducement to enter into the SARA and commit to performance over its entire five-year term." Compl.¶ 20. Until the facts are further developed, the Court cannot ascertain whether Verizon's agreement to forego the debt was simply an offer made by Verizon to encourage WaMu to purchase more services in the future, or whether it was – like the pre-loan expenditures in *DPJ* – a condition imposed by the bank as a pre-requisite to its entry into the SARA. Verizon states in its brief that the loyalty credits were "an express condition to entry into the SARA with WaMu." Pl.'s Opp. at 6. So the Court cannot say, under Rule 12(c), that it is clear that relief could not be granted under any set of facts consistent with the allegations in the complaint. The Court will

therefore deny defendant's motion for judgment on the pleadings with respect to the "loyalty credits" that Verizon seeks to recover.

It is important to note that the Court is not ruling at this time that the credits *are* recoverable – only that it cannot determine as a matter of law that they are not. Verizon offered more than one theory for why it is entitled to relief, and its suggestion that it should be able to obtain "the benefit of its bargain," Pl.'s Opp. at 13, raises concerns that the claim may ultimately be deemed to be improper expectation damages. But since, under *DPJ* and *Nashville Lodging,* there are some circumstances under which the relinquishing of a debt could constitute recoverable reliance damages, this aspect of Count I will not be dismissed.

### 2. Service and other credits

Verizon also seeks to recover $15 million in "service and other credits" which Verizon allegedly extended in exchange for WaMu's commitment to certain levels of service over the term of the SARA. Compl.¶ 21; Pl.'s Opp. at 8. Like the loyalty credits, because Verizon alleges that the "service and other credits" were granted to WaMu "against sums that were due and payable to Verizon under the prior contract between the parties," the Court cannot say that under no set of facts could provide a basis for recovery. Accordingly, on the face of the pleadings, the Court cannot grant judgment under Rule 12(c) with respect to the "service and other credits" that Verizon seeks to recover.

But as with the loyalty credits, it is important to note that the Court is not ruling at this time that the service and other credits *are* recoverable – only that it cannot determine as a matter of law that they are not. Indeed, as FDIC argues, it appears to the Court that the service credits are akin to promotional price discounts that accrued over time as WaMu utilized certain levels of Verizon's service, and they were deducted from WaMu's bills as WaMu earned the discount. If

that turns out to be the case – contrary to Verizon's assertion in the complaint that they are credits for sums already payable – then such damages may not be recoverable because WaMu already earned them under the terms of the contract. But at this stage, judgment on the pleadings is inappropriate because it is possible that Verizon could present evidence to demonstrate that it is entitled to such credits.

### B. Count I: Labor costs, out-of-pocket expenses, and financial concessions

#### 1. Labor costs and out-of-pocket expenses

Verizon also seeks material and labor costs it incurred as part of the facilities build-out, conversion and migration of WaMu to Verizon's network, as well as "other out-of-pocket costs" and "capital expenditures." Compl. ¶ 20. These types of costs, which Verizon paid in reliance on the contract, are compensatory damages under FIRREA. *Nashville Lodging*, 59 F.3d at 240. Thus, Verizon may be entitled to relief if it can prove facts consistent with these allegations, and the Court will allow the claims to proceed with respect to material and labor costs, capital expenditures, and out-of-pocket costs that would put it back in the position that it occupied before making the repudiated agreement. *Id.*

However, Verizon also seeks damages remaining on the final two and a half years of the repudiated contract. *See* Pl.'s Opp. at 16 ("Verizon never received 'its contracted-for benefit' in exchange for these outlays because the SARA was repudiated, denying Verizon the benefit of any performance by WaMu over the final two-and-half-years [sic] of that term."). The D.C. Circuit has held that this type of expectation damages is not recoverable under FIRREA. So although Verizon may recover damages to put it in the position it occupied before making the agreement, it cannot recover damages to put it in the same position it would have occupied but for the breach. *OPEIU II*, 27 F.3d at 604.

2. Financial concessions

Verizon also seeks to recover "financial concessions," Compl. ¶ 20, but does not explain what those concessions are and whether they differ in any way from the "credits" it seeks to recover. Without any factual allegations to support Verizon's claim, the Court finds that Verizon has failed to state a claim upon which can be granted. *Iqbal*, 129 S. Ct. at 1949. The Court will therefore dismiss Count I of the complaint with respect to "financial concessions" to the extent they differ from the "loyalty, service and other credits" previously discussed.

**C. Count II: Employee Costs**

In Count II, Verizon seeks damages from severance liability, outplacement costs, and the continuation of benefits that Verizon incurred in connection with the employees it hired to service the SARA but later terminated as a result of the repudiation. Compl.¶ 24. Verizon argues that the Verizon employees at issue in Count II were "Verizon's agents, retained specifically in order to perform Verizon's obligations under the SARA and constituting a component of Verizon's overhead and other out-of-pocket expenses actually incurred in direct reliance upon WaMu's five-year commitment under that agreement." Pl.'s Opp. at 19.

Although these costs qualify as compensatory damages, as opposed to lost profits, FIRREA further limits permissible damages to *direct* compensatory damages. As FDIC correctly points out, Verizon's liability for those costs arises from its contractual relationships with its employees, not from its contractual relationship with WaMu. Similar to the costs incurred with the third-party vendor in Count III that Verizon has conceded are not recoverable, the costs for employee severance, outplacement costs, and the continuation of benefits arise out of obligations that Verizon undertook with third-parties hired as employees. *See Petroleo Brasileiro, S.A., Petrobas v. Ameropan Oil Corp.*,372 F. Supp. 503, 508 (E.D.N.Y. 1974)

("[C]onsequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."). So the damages do not flow directly from the breach of the SARA, but from transactions that are collateral to the repudiated contract. The Court therefore concludes that they are indirect damages and are not recoverable under FIRREA. Accordingly, the Court will grant defendant's motion for judgment on the pleadings with respect to Count II.

## IV. The SARA Cannot Bar Recovery of Certain Damages

### A. The Liquidated Damages Provision

The FDIC argues that Verizon is not entitled to the damages it seeks under the terms of the SARA.[8] Indeed, the FDIC asserts:

> To recover repudiation damages under section 1821(e), Verizon 'must show, first, that it is contractually entitled to [such recovery] under the terms of the agreement.'" *RTC v. Management, Inc.*, 25 F. 3d 627, 632 (8th Cir. 1994); *see e.g.*, *Alltel*, 194 F. 3d at 1043 (plaintiff "not entitled to damages for minimum monthly payments . . . because such payments are not provided for in the Data and Item Agreements.").

Def.'s Mot. at 13. While the FDIC purports to cite the *RTC* and *ALLTEL* cases for this proposition, neither of those cases actually states that in order "to recover repudiation damages

---

8  In the event of WaMu's breach, the SARA bars certain damages, including "reliance damages." SARA § 33.1. But the SARA does allow Verizon to recover liquidated damages for lost profits in the form of a termination fee. SARA § 34.5. The termination fee is the "sole liability" in connection with a termination of the SARA "provided WaMu satisfies its associated obligations to pay a Termination Fee, as applicable." SARA § 34.5(d). Verizon does not seek to recover under the liquidated damages clause of the agreement because it recognizes such damages are not allowed under FIRREA. Pl.'s Opp. at 1, 10. But even though FIRREA displaces FDIC's obligation to pay the termination fee, FDIC also argues that the Court should look to the SARA in denying reliance damages, the same type of damages the D.C. Circuit has held are "presumptively recoverable" under FIRREA. *Nashville Lodging*, 59 F.3d at 246.

16

under section 1821(e)," the parties must first show that that they are contractually entitled to those damages.

In *RTC*, the party seeking to withhold funds from the receiver claimed that it was specifically entitled to a particular fee under Article 3 of the contract. The Resolution Trust Corporation ("RTC") argued both that the contract did not actually call for the payment of that fee and that the fee would not qualify as "actual, compensatory damages." So the Court started the analysis this way: "We turn now to Management's claim for the $200,000 Article 3 Fee. To prevail on this claim, Management must show, first, that it is contractually entitled to the Article 3 Fee under the terms of the Agreement and, second, that loss of the Article 3 Fee constitutes compensable damages under FIRREA. We address each of these issues separately." 25 F. 3d 631. FDIC's introduction and bracketed quotation from the case takes the quote out of its proper context and changes the meaning of the court's holding.

FDIC's representation with respect to *ALLTEL* is similarly disingenuous. In that case, the plaintiffs were making the specific argument that they were contractually entitled to a certain kind of damages, but the court rejected that argument. The court did not hold that in order to recover damages under FIRREA in the first place, the contract has to call for those particular damages.

Indeed, the court in *ALLTEL,* and the opinion in *OPEIU II* on which the *ALLTEL* court relied, addressed the inverse situation: both courts were grappling with the fact that under FIRREA, parties injured by a receiver's breach of contract may not be entitled to certain damages, even if they *are* provided for in the contract. In particular, they are not entitled to any liquidated damages that would have been available under the terms of the repudiated contract because, while liquidated damages are "compensatory" in nature – *i.e.*, they were occasioned by

17

the breach – they are not "actual." So, according to the D.C. Circuit and the Ninth Circuit, and under the FIRREA scheme, a party's rights and obligations under the contract are not co-extensive with, or determinative of, its rights and obligations under FIRREA.

For those reasons, the Court is not persuaded by FDIC's contract-based arguments. An injured party often cannot recover the specific forms of compensatory damages to which it would have been entitled in the event of an ordinary breach of the contract: lost profits and liquidated damages. Since Congress has substituted its own damage allocation scheme for whatever scheme was bargained for by the parties, this Court finds that it would be inappropriate to deny plaintiff reliance damages on the grounds that they are barred by the terms of the contract, when it cannot grant them the liquidated or future profit damages the contract provided for instead. And the cases cited by the FDIC do not require this Court to do so.

### B. The Rates and Charges Provision

Finally, the FDIC also argues that the out-of-pocket and labor costs are included in the rates and charges that it fully paid, and therefore, they cannot be included in Verizon's damage claim. Section 10.2(a) of the SARA provides:

> All costs associated with providing the Services, including the support required to fulfill Supplier's obligations under this Agreement relating to all Services and the normal foreseeable growth of WaMu Group Companies' business during the Term in relation to such Services are included as part of the Rates and Charges. Furthermore, it is understood and agreed by the Parties that all of Supplier's activities necessary or customary in connection with providing the Services are included in such Rates and Charges.

Section 10.2(b) further provides: "Supplier acknowledges that, consistent with Subsection (a), incidental and overhead expenses that Supplier incurs in performing the Services . . . are included in the Rates and Charges." Verizon readily acknowledges that the parties began performing their respective obligations under the SARA, and that it was paid for services

18

rendered after FDIC assumed the contract. But these provisions only entitle FDIC to offset the amounts that WaMu paid in partial performance of its obligations under the SARA before the repudiation. *See Westfed Holdings v. United States*, 407 F.3d 1352, 1370 (Fed. Cir. 2005). They do not bar recovery of all of the out-of-pocket costs that Verizon paid in preparing to perform on the contract.

## V. Conclusion

For the reasons stated above, the Court will grant in part and deny in part defendant FDIC's motion for judgment on the pleadings. A separate order will issue.

/s/ Amy B. Jackson
AMY BERMAN JACKSON
United States District Judge

DATE: August 22, 2011